**Affirmed and Opinion filed November 4, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-13-00144-CR

**HERMILO MORALEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Cause No. 63639**

# O P I N I O N

Appellant Hermilo Moralez appeals following his conviction for murder.[1] In seven issues, appellant contends (1) the trial court erred by requiring him to prove he was mentally incompetent to stand trial after a prior judicial finding of incompetency; (2) the evidence is insufficient to support the jury's finding of competency; (3) the trial court erred denying his motion to suppress; (4) the State

---

[1] *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.02(b)(2) (West 2011).

failed to disprove he acted in self-defense; (5) the trial court erred admitting photographs and a DVD of the complainant's body into evidence; (6) the trial court erred allowing evidence of extraneous offenses into evidence; and (7) the trial court erred by failing to admit the Agreed Judgment of Incompetency into evidence during the punishment phase. For the reasons stated below, we overrule appellant's issues and affirm the jury's verdict.

## BACKGROUND

In November 2010, the complainant, a high school student, was reported as a missing person. Appellant was seen near the location where the complainant's truck was found and questioned. Ultimately, appellant led police to the location of the complainant's body. Appellant was arrested and charged with murder.

Subsequently, appellant was found incompetent to stand trial. Following treatment, it was determined that appellant's competency to stand trial had been restored. Appellant requested a jury hearing on the issue of his competency and the jury found appellant was competent to stand trial.

Following the denial of appellant's pre-trial motion to suppress and motion to quash subpoena duces tecum filed by the Texas Department of State Health Services, trial on the merits began. The jury was charged on appellant's claim of self-defense but rejected it and found appellant guilty of murder. The jury assessed appellant's punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for life. From those proceedings, this appeal was brought.

## COMPETENCY TO STAND TRIAL

Appellant was arrested in November 2010. On July 2, 2011, the trial court referred appellant for a competency examination in accordance with Chapter 46B

of the Texas Code of Criminal Procedure. On August 30, 2011, Dr. Michael Alan Fuller reported that appellant was not competent to stand trial. On October 30, 2011, an Agreed Order of Incompetency was signed by the trial court. On February 14, 2012, the trial court was informed appellant remained incompetent to stand trial. On March 20, 2012, the trial court signed an Amended Order for Extended Commitment and Compelled Medications. A Second Amended Order for Extended Commitment and Compelled Medications, finding the head of the facility requested an extension, was signed on July 29, 2012.

On September 12, 2012, Brenda L. Slaton, the Superintendent of Rusk State Hospital, reported to the trial court that appellant was competent to stand trial. On October 26, 2012, appellant objected to the finding of competency. An agreed request for a jury trial was filed that same day. On November 14, 2012, the jury found appellant was competent to stand trial. The trial court signed an Order Finding Competency to Stand Trial on November 15, 2012. Defendant's pretrial motions were heard on the 8th and 14th of January 2013 and voir dire began on January 16, 2013.

## I.     Finding of Competency

In his first issue, appellant makes two arguments. One argument is that the trial court failed to make a judicial determination that he had regained competency before criminal proceedings resumed.

When a trial court determines that a defendant is incompetent to stand trial, the court may commit the defendant to a mental health facility "for further examination and treatment toward the specific objective of the defendant attaining competency to stand trial."[2]  When the "head of the facility" is of the opinion that

---

[2] Act of May 14, 2003, 78th Leg., R.S., ch. 35, 2003 Tex. Gen. Laws 62 (amended 2005, 2007, 2011, 2013) (current version at Tex. Code Crim. Proc. Ann. art. 46B.073(b) (West Supp.

the defendant has attained competency to stand trial, a report is filed with the court, with copies provided to both parties, and the defendant is returned to the committing court.[3]  Article 46B.084[4] of the Texas Code of Criminal Procedure requires that, after a defendant has been adjudicated incompetent to stand trial and has been committed to a mental hospital, the trial court must make a judicial determination that the defendant has regained competency before the criminal proceedings against him may be resumed. *See also Bradford v. State*, 172 S.W.3d 1, 4–6 (Tex. App. — Fort Worth 2005, no pet.) (trial court was required to make a judicial determination of competency before proceeding with an adjudication of guilt); and *Byrd v. State,* 719 S.W.2d 237, 238 (Tex. App. — Dallas 1986, no pet.) (appeal was abated because there was no judicial determination on the record).

The record reflects the trial court signed an order on November 15, 2012, finding appellant competent to stand trial. This order was entered before appellant's trial on the merits proceeded. We therefore find the trial court did make a judicial determination that appellant had regained competency before criminal proceedings resumed.

We understand appellant's other argument to be that because the competency hearing occurred before the trial court signed the order on November 15, 2012, the State was required to establish beyond a reasonable doubt that appellant was competent to stand trial. Appellant argues the burden of proof is not

---

2014)).

[3] Act of June 15, 2007, 80th Leg., R.S., ch. 1307, 2007 Tex. Gen. Laws 4389 (amended 2011) (current version at Tex. Code Crim. Proc. Ann. arts. 46B.079(b)(1), (c) (West. Supp. 2014); Act of June 15, 2007, 80th Leg., R.S., ch. 1307, 2007 Tex. Gen. Laws 4390 (current version at Tex. Code Crim. Proc. Ann. art. 46B.081 (West Supp. 2014)).

[4] Act of June 15, 2007, 80th Leg., R.S., ch. 1307, 2007 Tex. Gen. Laws 4390 (amended 2011) (current version at Tex. Code Crim. Proc. Ann. art. 46B.084(a) (West Supp. 2014)); and Act of May 14, 2003, 78th Leg., R.S., ch. 35, 2003 Tex. Gen. Laws 64 (amended 2005, 2007, 2011) (current version at Tex. Code Crim. Proc. Ann. art. 46B.084(d) (West Supp. 2014)).

by a preponderance of the evidence and did not shift to him to prove incompetence until after the trial court made a judicial determination.

Appellant relies upon *Manning v. State*, 730 S.W.2d 744, 748 (Tex. Crim. App. 1987), and *Schaffer v. State*, 583 S.W.2d 627, 630 (Tex. Crim. App. [Panel Op.] 1979). In *Manning,* the court noted that "the case law through the years is fairly clear that a defendant has the burden of proving by a preponderance of the evidence, his incompetency to stand trial or his insanity at the time of the offense. Case law is also clear that the burden of proof shifts to the State if a prior, unvacated adjudication of incompetency or insanity is shown." *Manning*, 730 S.W.2d at 748 (citations omitted). The court then held "consistent with common law, that if such prior adjudication for incompetency is shown, the State must then prove the accused's competency to stand trial beyond a reasonable doubt." *Id.* The *Manning* court pointed out that "[n]othing in the Penal Code or Code of Criminal Procedure suggests we abandon this long established burden shifting on the issue of incompetency or insanity and we decline to do so in the instant case."

In *Shaffer*, the defendant argued the notification by the superintendent of the facility that he was competent to stand trial was not a judicial determination and that there should be some form of judicial restoration before the trial on the merits. *Shaffer*, 583 S.W.2d at 628. The *Shaffer* court agreed and noted, "[t]he general rule would seem to be that a person is presumed competent to stand trial until he is found incompetent to stand trial, and once found to be so incompetent, he is presumed to be incompetent to stand trial until such time as it has been determined in accordance with the law that he is competent to stand trial." *Id.* at 630. The *Shaffer* court found there was no evidence in the record that the trial court ever made a determination of the defendant's competency to stand trial prior to the trial on the merits after he had earlier been found incompetent to stand trial by a jury.

5

The court then abated the appeal for the trial court to make such a determination. *Shaffer* did not address the burden shift. Unlike *Shaffer,* in this case the trial court did make a judicial determination prior to the trial on the merits.

We find *Manning* is also distinguishable since the legislature has subsequently shifted the burden on the issue of incompetency in certain circumstances. Article 46B.113(d)[5] provides: "If the head of a facility or outpatient treatment provider to which the defendant was committed as a result of a finding of incompetency to stand trial has provided an opinion that the defendant has regained competency, competency is presumed at a hearing under this subchapter and continuing incompetency must be proved by a preponderance of the evidence." Under the statutory scheme, placement of the burden of proof at the hearing depends upon whether the head of the facility determines the defendant has been restored to competency. Per subsection (d), competency will be presumed at the hearing if the head of the facility or outpatient treatment provider has tendered an opinion that the defendant has been restored to competency. In such a case, incompetency must be proven by a preponderance of the evidence. In contrast, if the facility head or outpatient treatment provider has not provided an opinion that the defendant has been restored to competency, subsection (e) directs that the defendant is presumed still incompetent and competency must be established by a preponderance of the evidence by whichever party is contending the defendant is competent.[6] *See also* 7A Tex. Prac., Criminal Forms and Trial Manual § 81.13 (11th ed.) (charge of the court on restoration of competency).

___

[5] Act of June 15, 2007, 80th Leg., R.S., ch. 1307, 2007 Tex. Gen. Laws 4394 (amended 2011) (current version at Tex. Code Crim. Proc. Ann. arts. 46B.113(d (West. Supp. 2014)). Article 46B.113 is contained in Subchapter E and became applicable in this case upon issuance of the Second Amended Order for Extended Commitment and Compelled Medications. *See* Tex. Code Crim. Proc. Ann. arts. 46B.085(b) (West. Supp. 2014)).

[6] Act of June 15, 2007, 80th Leg., R.S., ch. 1307, 2007 Tex. Gen. Laws 4389 (amended

Because the head of the facility provided the trial court with an opinion that appellant had been restored to competency, he had the burden to prove by a preponderance of the evidence that he was incompetent. *See Howard v. State,* 01-07-00686-CR, 2008 WL 3876227 (Tex. App.—Houston [1st Dist.] Aug. 21, 2008, pet. ref'd) (mem. op.) (not designated for publication). Accordingly, the trial court's charge to the competency jury instructing them that appellant had the burden of proof, by a preponderance of the evidence, to establish that he was incompetent to stand trial was correct. *Id.* Having rejected both of appellant's arguments, we overrule appellant's first issue.

## II. Sufficiency of the Evidence

In his second issue, appellant challenges the legal sufficiency of the evidence to support the jury's finding that he was competent to stand trial. Within this issue, appellant also argues the trial court's charge to the jury misstated the burden of proof. As noted above, the charge correctly instructed the jury. Accordingly, we review the evidence adduced at the hearing on appellant's competency to determine if appellant proved, by a preponderance of the evidence, that he was incompetent to stand trial.

### A. The Evidence

Dr. Fuller was qualified as an expert to testify on appellant's behalf. As part of his job, Fuller evaluates defendants to determine whether or not they are competent to stand trial. Fuller first assessed appellant's competency to stand trial in July 2011. It was his opinion at that time that appellant was not competent to stand trial. It appeared appellant was having auditory hallucinations and Fuller felt he was delusional. Fuller believed appellant could not rationally pursue a defensive

---

2007, 2011) (current version at Tex. Code Crim. Proc. Ann. arts. 46B.113(e) (West. Supp. 2014)).

strategy and questioned whether or not he had a rational understanding of the charges pending against him. Fuller's initial diagnosis was an unspecified psychotic disorder. Fuller testified that appellant had no prior psychiatric history and no documented history of mental illness. According to Fuller, this could have been appellant's initial episode of psychosis.

After the Agreed Judgment of Incompetency was signed in October 2011, appellant was sent to North Texas State Hospital, the Vernon Campus. A report from Dr. Joyce dated February 2012 was admitted into evidence. Joyce concluded appellant was unable to demonstrate an adequate rational understanding of the charges or the proceedings and could not collaborate effectively with an attorney. In March 2012, the trial court entered an order extending appellant's commitment and compelling medication.

In May 2012, Fuller visited appellant and found significant improvement. Appellant was disinterested and not cooperative with the examination but Fuller found his comments reflected a much more coherent state of mind. Because appellant refused to answer many questions, Fuller was unable to thoroughly examine him. The questions appellant did answer were generally reality-based and thoughtful enough that Fuller felt appellant could go to trial, if he were so motivated. Fuller determined appellant was competent to stand trial but admitted it was "borderline."

Fuller believed appellant's medications had been discontinued about a month earlier. He feared that appellant would deteriorate but found that he was actually improved. Dr. Emory, a jail psychiatrist, revised the diagnosis of undifferentiated schizophrenia and discontinued appellant's psychotropic medication. Fuller testified that it was Emory's impression appellant was

8

malingering his residual symptoms and was not certain that he had a mental illness.[7] Fuller is confident appellant is schizophrenic.

Evidence was introduced that appellant was refusing to take medication while in the hospital in February 2012. Fuller testified that medication is an essential part of the treatment plan for schizophrenia and agreed compelled medication would help appellant respond faster. Fuller agreed that appellant's avoidance of taking medication could be part of his illness and not evidence of malingering. According to Fuller, a large percentage of people with schizophrenia do not take their medications regularly because they do not think they are ill. Fuller also said appellant's refusal to answer questions was not necessarily malingering and could have been a rational decision. It was Fuller's impression the refusal was willful but the motive was unclear. Regardless of appellant's reason for not taking the medication, it delayed his treatment and response.

Appellant requested to attend his recommitment hearing. Fuller testified that indicated some comprehension of the proceedings. Fuller said it was his clinical impression that a significant amount of appellant's behavior reflected an attempt to avoid prosecution.

An affidavit by Sandy Le asked for an extension of treatment because appellant was responding slowly to treatment. In July 2012, appellant's commitment was again extended by the trial court. Appellant was returned to the hospital, this time in Rusk, and continued on medication.

Fuller examined appellant again on November 9, 2012, and reported that he was competent to stand trial. Fuller found progress in appellant's ability to have a reasonable reality-based conversation, his awareness of the consequences that he

---

[7] Fuller defined malingering as faking symptoms and said that in the patients he sees the most common reason is to avoid prosecution.

potentially faces, his ability to share with his attorney the events and state of mind that was transpiring at the time of the alleged crime, and his overall psychic health. Fuller testified that he felt appellant was competent to stand trial before he was returned to the state hospital and he had certainly improved further from that point. Fuller testified that appellant was currently taking medication — Risperdal, an antipsychotic medication, and Prozac, an antidepressant.

Fuller reviewed the report of Dr. Erick Lenert, a psychologist at Rusk State Hospital, dated September 2012. Lenert determined appellant was competent to stand trial and Fuller testified that decision was consistent with his own perception. Lenert's report included a letter of discharge from Dr. Jill Pontius, the staff psychiatrist. Pontius reported appellant "is at risk for relapse of his severe psychotic illness. Though he is being released to the court as competent to stand trial, he is at high risk of relapse in a less secure environment; especially if his medication adherence is not strictly monitored."

At the hearing, Fuller testified that he had seen appellant in the last week and appellant was much improved compared to May 2012. Fuller testified appellant had the capacity to rationally understand the charges and potential consequences of the pending proceedings. In Fuller's opinion, appellant had the capacity to disclose to counsel pertinent facts, events, and states of mind. Appellant was able to describe some details of the alleged offense. Appellant had the capacity to engage in legal strategies and opinions and to exhibit appropriate courtroom behavior. Appellant had the capacity to testify and consult with counsel.

Dr. Lenert was qualified as an expert to testify on the State's behalf. Lenert performed an independent evaluation of appellant's competence to stand trial in September 2012. Appellant was on medication, an antipsychotic and an antidepressant. Appellant's mood appeared stable and he was polite and

10

cooperative. Appellant was responsive and spoke in a logical and goal-directed fashion to Lenert's inquiries. Appellant indicated that he was aware of the charges pending against him.

Lenert determined appellant could communicate with his counsel in a rational manner. Appellant stated facts and gave details about the circumstances surrounding his arrest, and spoke to his state of mind at the time of the offense. Appellant was able to recall details of the offense. Lenert determined appellant was competent to stand trial. Appellant had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. Appellant had a rational and factual understanding of the proceedings against him.

After appellant began taking an antidepressant, he relaxed more and was more socially available. Lenert testified that drug use can sometimes mimic the symptoms of schizophrenia and his report mentioned substance abuse. Fuller had also testified that substance abuse may contribute to mental illness.

Lenert estimated appellant's IQ to be below average. Lenert assessed appellant's ability to function at 50. Upon his initial admission, appellant's ability to function was assessed at 28. Lenert testified that showed improvement.

Lenert did not find any evidence appellant was malingering. Lenert found appellant gave his best effort, did not appear to be malingering memory or cognitive difficulties, and was not exaggerating his psychiatric symptoms.

Linda Smith is a qualified mental health professional employed by the Gulf Coast Center. She supervises a program for offenders that have mental health issues. Smith met appellant at the jail on November 19, 2010. She saw no indication that he was responding to internal stimuli. On January 3, 2011, she again came into contact with appellant. Appellant made eye contact and again gave no

11

indication that he was responding to internal stimuli. Smith was able to hold a conversation with him. On January 4, 2011, she evaluated appellant again and he denied any suicidal tendencies. Appellant made eye contact, held a conversation, and did not appear as if he was responding to internal stimuli.

The next time Smith saw appellant was September 29, 2011, after he got into a fight with officers. Appellant communicated with her, made eye contact, and denied responding to any type of internal stimuli. Smith saw no indication that appellant was responding to any type of internal stimuli.

Smith saw appellant again on March 19, 2012, to let him know that he had been recommitted to the state hospital. Smith saw no difference in appellant from before he went to the state hospital and after he came back. Appellant communicated with her, made eye contact, and was not responding to any type of internal stimuli.

On April 17, 2012, Smith checked on appellant because his psychiatric medications had been discontinued by Emory. Appellant seemed to understand that he was no longer required to take medication and told Smith that he felt better. The last time Smith saw appellant was October 12, 2012.

Smith testified that on the various occasions she spoke with appellant, he was able to communicate with her, made eye contact, and did not respond to any type of internal stimuli. Smith never felt the need to refer appellant for a competency evaluation. Smith testified that based on the ten meetings, at least, she had with appellant and her twenty-four years of experience dealing with schizophrenic people, she would disagree appellant is schizophrenic. Smith did not believe appellant had the symptoms that he reported and she saw no change in him. Smith testified that she believed appellant is competent to stand trial. She agreed

that he has the ability to communicate with his attorneys about the issues in this case and is aware of the charges and the proceedings in the courtroom.

Sergeant Patrick Matocha, a mental health deputy for the Brazoria County Sheriff's Department, testified he came into contact with appellant when he first came to the jail. Matocha did not notice anything about appellant's mental health or competency that alarmed him but was concerned whether appellant posed a safety risk to himself. Matocha transported appellant to and from the state hospital three or four times. Coming back from the state hospital in Vernon, an eight-hour car drive, appellant did not interact with Matocha at all. As they were entering the jail, Matocha asked him, "why he didn't sign the piece of paper to stay in Vernon State Hospital where it was nice and more medical care, mental care." Appellant said, "that he couldn't stay at that hospital because they – they wrote down and took notes of everything that he said or done to prove that he was capable of standing trial." According to Matocha, appellant said "that the doctors couldn't make a decision on whether he was mental or not if they – if he couldn't talk to them." Matocha said appellant got that advice from Lionell West, another inmate in the jail. West has been through the detention center more than once and is involved in the mental health system as well.

Matocha picked appellant up from the state hospital in Rusk in September 2012. Appellant had gained some weight and was more talkative. Appellant had three large sacks of possessions and Matocha asked him to go through the sacks and decide what he wanted. Appellant was able to do that on his own and verbalize what he wanted to keep. Appellant also indicated his favorite items. Matocha was able to communicate with him and make eye contact. Appellant did not appear to be responding to anything that was not there. Matocha admitted that he had no training to determine competency.

13

## B. Analysis

We measure the propriety of the competency verdict based on the evidence before the jury at the time of the verdict under the relevant legal standard set out in out in art. 46B.113(d). *See Morris v. State*, 301 S.W.3d 281, 292 (Tex. Crim. App. 2009). Fuller and Lenert were both qualified to testify as experts and both testified to their opinion that appellant was competent to stand trial. According to Fuller and Lenert, appellant had "a sufficient present ability to consult with the lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *See id* at 292-93 (citing Tex. Code Crim. Proc. Art. 46B.003(a) (West. 2006)). The competency jury was entitled to credit the opinion testimony of these experts. The jury also heard Smith testify to her opinion that appellant was competent and heard Matocha's description of appellant's behavior when taken from Rusk two months before the hearing. No evidence to the contrary was presented at the hearing.

We find the jury's verdict rejecting appellant's claim of incompetency was not against the great weight and preponderance of the evidence. *Id*. Appellant's second issue is overruled.

### MOTION TO SUPPRESS

Appellant's third issue argues the trial court erred denying his motion to suppress. Appellant moved to exclude all statements obtained from him and any and all physical evidence obtained as a result of those statements. Following a hearing, the trial court denied appellant's motion.

Appellant testified during the guilt-innocence phase of trial and admitted to killing the complainant. It is well-settled that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence

14

which is not challenged. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998). An exception arises when the defendant is impelled to testify either (1) to overcome the impact of the objected-to evidence that the State allegedly obtained in violation of the law; or (2) to meet, destroy, or explain the objected-to evidence offered by the State by presenting rebutting evidence. *Id.* at 718–19. However, appellant did not argue at trial, nor does he on appeal, that his testimony was impelled by the introduction of the allegedly illegally obtained statements and evidence. We cannot speculate as to whether appellant would have testified under different circumstances. *See Davis v. State*, 203 S.W.3d 845, 855 (Tex. Crim. App. 2006).

Moreover, the record clearly shows that the purpose of appellant's testimony was to present his claim of self-defense, not to overcome the impact of the State's evidence or to rebut it. Thus neither exception applies and any error in admitting the statements or evidence obtained therefrom was rendered harmless by appellant's own testimony. Appellant's third issue is overruled.

## SELF-DEFENSE

In his fourth issue, appellant claims the State failed to prove that he did not kill the complainant in self-defense. A person is justified in using deadly force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." Tex. Penal Code Ann. § 9.32(a)(2)(A) (West 2011). "Deadly force" is force "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

The initial burden to produce evidence supporting self-defense rests with the defendant. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003);

15

*Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Once the defendant produces some evidence, the State bears the ultimate burden of persuasion to disprove the raised defense. *Saxton*, 804 S.W.2d at 913. This burden of persuasion does not require that the State produce evidence, but it does require that the State prove its case beyond a reasonable doubt. *Id*. The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject any defensive evidence on the issue. *Id*. at 913–14. If the jury finds the defendant guilty, then it implicitly finds against the defensive theory. *Id*. at 914.

When reviewing a sufficiency challenge on the issue of self-defense, a reviewing court views the evidence in the light most favorable to the verdict to see if any rational trier of fact could have found (1) the essential elements of murder beyond a reasonable doubt, and (2) against appellant on the self-defense issue beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914. The jury is the exclusive judge of the credibility of the witnesses and of the weight to be given to their testimony. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Id.* We resolve any inconsistencies in the testimony in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

## I.    The Evidence

In his testimony, appellant admitted to the elements of the offense with the exception of whether he acted with the requisite intent. *See* Tex. Penal Code § 19.02(b) (West 2011). The question, therefore, is whether a rational trier of fact could have found (1) appellant intentionally or knowingly caused the complainant's death, or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the complainant's death, and (2) that appellant did not act in self-defense.

## A. *Appellant's Testimony*

Appellant testified the complainant gave him a ride home from school that day because he wanted to see appellant's marijuana plants. Appellant suggested the complainant drive to the back and park close to the backyard. Appellant testified that was in case his parents came home early. While appellant was taking care of his plants, the complainant kicked his dog. Appellant yelled at the complainant and the complainant pushed him. Appellant pushed him back and they began to fight. The complainant punched appellant in the face. Appellant had a scrape near his eye on the left side of his face. They were on the ground and then "it got serious because we started to choke each other…" Appellant testified that the complainant had a longer reach and choked him first. He stated, "I had to get close. Well, I had to get closer to inflict any damage to him, you know. I am a trained fighter. I know how to fight. Though I was getting hit, you know, because of the reach of his arms and I just got close and I was able to inflict damage on him." The complainant got him in a choke hold and said, "I'm not going to stop until you fall asleep." Appellant took that as dangerous to his life. He testified that he "feared passing out" and death was in his mind. Appellant said he was scared and "tried my best to defend myself even more by just being more forceful and attempting to inflict more damage to him." Appellant got out of the choke hold and grabbed a closet rod from the ground and struck the complainant in the side of head, shattering the rod.[8] Appellant testified that "he did not get up after that." Appellant testified, "that's when I panicked of him not being alive."

Appellant said he did not mean to kill the complainant. Appellant did not know what to do and "wanted to cover it up." Appellant washed down the blood in

---

[8] The rod was described as a closet or curtain rod. It was three and a half feet in length and did not appear to be rotten or weakened.

17

the backyard. He put the complainant's shirt over his face.  He tied up the body and put it into the back of the truck and drove to a wooded area where he could dump it. Before he got there, he bought gasoline. He set the body on fire and ran away. Appellant then took the truck and parked it in front of a "grill place." He put everything in the truck in the backpack and threw it in a trash can along with the complainant's shoes. He kept the key to the truck. Appellant claimed the complainant's shoes fell off. He also claimed the complainant's socks came off while he was taking the body into the woods.

Appellant then went to the movies. When asked, "Didn't you feel uncomfortable going to a movie after all this happened," appellant answered, "It didn't feel weird."

Appellant testified that he weighed 150 pounds. He said he had been a trained martial arts fighter for about four years and was a black belt and assistant instructor for a black belt karate school.

Appellant said he did not kick the complainant, but "might have kneed him" in the sides and stomach a couple of times. Appellant stated that he used a combination of simple front punches to the nose that might have crushed it, "with a counter of back — back punch and the combination of hitting the sides with a powerful left hand." Appellant targeted his punch to complainant's cheek and nose in order to impair his vision. Appellant demonstrated that he grabbed the complainant by the hands and forced his knee into the complainant's side. Appellant could not estimate how many times he hit the complainant in the face but claimed that he did not hit the complainant after he went down on the ground.

Appellant admitted that he hit the complainant in the face with the closet rod and it broke. He agreed that he used it as a deadly weapon but said he did not want to kill him. Appellant testified the complainant was getting up off the ground when

18

he swung the rod and hit him in the face with it. According to appellant, they tripped over each other and both of them fell to the ground. Appellant also testified that he strangled the complainant with his hands by squeezing his throat while the complainant was on the ground. According to appellant, they were both trying to choke each other. Appellant testified that he had "been taught different ways to, well, hurt someone to death."

### B. Other Evidence

Geoffrey Weis testified that about two weeks before the complainant was killed, appellant asked him what he would do with the body if he ever killed someone. Appellant had also asked Weis if he knew where to scrap a car.

Daira Chavira, appellant's former girlfriend, testified that appellant told her if someone hurt her, "[h]e would tie them down, torture them, burn them, cut their fingers off;" [h]e would burn them, watch them die, make them suffer;" "[he] would torture them." Chavira said he made those statements more than once.

The complainant's body was found with his hands tied behind his back and his ankles tied together; his feet were bare. A shirt was over his head and there was a rope around his neck. The complainant, with his clothing on and the body bag, weighed 100 pounds. The complainant was described as less than five foot eight inches, small-boned, and not muscular. Appellant was described as in shape, muscular, and very fit.

The evidence showed three fatal injuries had been inflicted on the complainant: blunt head trauma, blunt abdominal trauma, and strangulation. The complainant had been beaten in the head and had bruises and fractures. He had hemorrhaging in his brain and around his mouth. The complainant's eyes showed evidence of strangulation, probably by hands or a forearm. He was strangled and

19

released, over and over again. The complainant was not strangled with a ligature. The complainant had a significant amount of hemorrhaging to his voice box and larynx, which was cracked in half. The damage to the larynx was caused by strangulation plus a blow to the neck. It takes approximately four minutes to strangle a person. There was bruising on the complainant's neck from hands or fingers. The complainant also suffered a blow to the ear. The complainant had significant liver and spleen damage caused by blunt force trauma. The spleen was hemorrhaged, an injury consistent with a kick. The liver showed hemorrhaging and was lacerated.

## II.    Analysis

Appellant contends the evidence tended to prove he was justified in using deadly force against the complainant because he reasonably believed that deadly force was immediately necessary to protect himself against the complainant's use of unlawful deadly force. The only evidence appellant refers to is his own testimony. Appellant's testimony alone does not conclusively prove self-defense as a matter of law. *See Saxton*, 804 S.W.2d at 914; *Hull v. State*, 871 S.W.2d 786, 789 (Tex. App.—Houston [14th Dist .] 1994, pet. ref'd); and *Denman v. State*, 193 S.W.3d 129, 133 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (providing that appellant's testimony of self-defense is not enough to render evidence insufficient). Because the jury is the sole judge of credibility and weight to be given the testimony, the jury was not obligated to believe appellant's account. *See Saxton*, 804 S.W.2d at 914.

The record contains evidence from which a rational trier of fact could have found appellant acted with intent, either to cause the complainant's death or serious bodily injury. Appellant was a trained martial arts fighter with four years of experience and a black belt. He testified that he was capable of hurting someone

"to death" and said that he struck the complainant "to inflict damage." Appellant claimed not to have struck the complainant after the blow with the rod rendered him unconscious. However, from the substantial amount of damage inflicted the jury could have found the complainant was beaten severely prior to that blow — only one of the three fatal injuries suffered by the complainant. From the evidence, the jury could have found appellant punched the complainant in the face hard enough to crush his nose, kneed him in the body causing his spleen to hemorrhage and lacerating his liver, and either delivered a blow or squeezed his throat hard enough to break the complainant's larynx in half. The jury was entitled to infer appellant intended to injure or kill the complainant from all of his conduct, including his act of tying him up and burning his body to cover up the death. *See Meadoux v. State*, 307 S.W.3d 401, 415 (Tex. App.—San Antonio 2009) *aff'd*, 325 S.W.3d 189 (Tex. Crim. App. 2010). Reviewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914.

By its verdict, the jury believed appellant was not justified in using deadly force against the complainant and implicitly rejected appellant's claim of self-defense. *See Zuliani*, 97 S.W.3d at 594. Viewing the evidence in the light most favorable to the verdict, we cannot conclude the jury was irrational. The complainant was found tied up with his head covered and his body was burned. Appellant's former girlfriend testified that he had described killing someone in that manner more than once. Although appellant claimed that he and the complainant were trying to choke each other, only the complainant had bruises on his neck and injuries consistent with strangulation. The single scrape on appellant's cheek was the only injury he suffered in what he described as an ongoing struggle. The complainant, on the other hand, suffered three fatal injuries to his head, neck and

21

body. The jury rationally could have disbelieved appellant's testimony that his use of deadly force was immediately necessary to protect himself from the complainant's choke hold, which appellant had already escaped. *See* Tex. Penal Code § 9.32(a). Considering all the evidence in the light most favorable to the jury's verdict, we conclude a rational jury could have rejected appellant's self-defense claim. *See Saxton*, 804 S.W.2d at 914. We overrule appellant's fourth issue.

## ADMISSION OF PHOTOGRAPHIC EVIDENCE

Appellant's fifth issue contends the trial court erred by admitting photographs of the complainant in violation of Rule 403 of the Texas Rules of Evidence. The record reflects the State introduced into evidence State's exhibits 27 through 38. Exhibit 38 is a DVD recording of the discovery of the complainant's body and Exhibits 27 through 37 are photographs of the body taken after its discovery. Appellant objected on the grounds the photographs were more prejudicial than probative. *See* Tex. R. Evid. 403. The trial court overruled the objection.

"The decision to admit or exclude photographic evidence is generally left to the sound discretion of the trial court. In deciding whether photographs are unfairly prejudicial, we must also consider the following factors: the number of photographs, the size, whether they are in color or black and white, whether they are gruesome, whether any bodies are clothed or naked, and whether a body has been altered by autopsy." *Prible v. State*, 175 S.W.3d 724, 734 (Tex. Crim. App. 2005). The number of complained-of exhibits is eleven. The photographs are 7 by 10 ¾ inches and in color. The DVD is in color. The body is clothed and has not been altered by autopsy. The photographs and DVD depict the complainant's body

22

as discovered. The crime scene photographs and recording were limited in number to eleven.

Photographs depicting the location of a body at the crime scene and the complainant's injuries are relevant. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). "A visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination. The fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Even if photographs are gruesome, their probative value is not substantially outweighed by the danger of unfair prejudice under Rule 403 if "they are no more gruesome than the crime scene itself as it was found by the police." *Shuffield*, 189 S.W.3d at 787. Photographs of a complainant's injuries are admissible under Rule 403 if they "show only the injuries that the victim received and are no more gruesome than would be expected." *Id.* at 787–88. The exhibits added to the probative value of the State's case by assisting the jury in understanding the testimony presented regarding the injuries sustained by the complainant. Although the exhibits are disturbing and graphic, they "were no more gruesome than would be expected in this sort of crime." *Gallo*, 239 S.W.3d at 763.

Considering the requisite factors, we cannot conclude that the prejudicial effect of the disputed photographs substantially outweighed their probative value. Accordingly, we find the trial court did not abuse its discretion in admitting the exhibits. Appellant's fifth issue is overruled.

## EXTRANEOUS OFFENSES

In his sixth issue, appellant claims the trial court erred by admitting evidence of extraneous offenses. A hearing was held outside the presence of the jury to determine whether the testimony of Daira Chavira should be admitted. Appellant

objected to her testimony on the grounds it was more prejudicial than probative. *See* Tex. R. Evid. 403. The trial court overruled the objection, finding that the testimony "is more probative than prejudicial. And with regard to the incidents that have been discussed with the witness by the defendant, they go to intent, to plan, to scheme, and are, therefore, more probative than prejudicial. . . . I will find that the proffered testimony is relevant to the issues in dispute, in this case specifically, that it deals with the specific defense that has been presented by the defendant in, so far, the ten hours of testimony with regard to self-defense, in that it is relevant with regard to the issues of preparation and absence of mistake or accident under 404(b)."

Chavira then testified that she met appellant when she was 15 and they dated for two years. According to Chavira, appellant was very passionate about his hobby, martial arts, and he had a black belt. Chavira testified that appellant told her if someone hurt her, "[h]e would tie them down, torture them, burn them, cut their fingers off;" [h]e would burn them, watch them die, make them suffer;" "[he] would torture them." Chavira said he made those statements more than once. Chavira testified that on more than one occasion they had a conversation about what would happen if he was ever caught doing something bad and he told her that "[h]e would act like he was crazy. . . [s]o he could get out of it."

Evidence is relevant if it tends to make the existence of any consequential fact more or less probable than it is without the evidence. Tex. R. Evid. 401; *Goldberg v. State*, 95 S.W.3d 345, 374 (Tex. App. — Houston [1st Dist.] 2002, pet. ref'd). The trial court found the evidence was relevant to establish intent, plan, and scheme, and to rebut appellant's claim of self-defense. We agree.

Even if evidence is relevant, however, the trial court may nevertheless exclude it if the probative value of the evidence is substantially outweighed by

24

unfair prejudice. Tex. R. Evid. 403; *Mason v. State*, 416 S.W.3d 720, 739 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). When balancing probativeness and prejudice, a presumption exists favoring probative value. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990). The following factors are included in a Rule 403 balancing test:

> (1) how compellingly the evidence serves to make a fact of consequence more or less probable;
>
> (2) the potential the evidence has to impress the jury "in some irrational but nevertheless indelible way;"
>
> (3) the time the proponent will need to develop the evidence; and
>
> (4) the force of the proponent's need for this evidence to prove a fact of consequence.

*Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000) (citing *Montgomery*, 810 S.W.2d at 389–90). We will reverse only upon a clear abuse of discretion. *Montgomery*, 810 S.W.2d at 390 (stating that as long as the trial court operates within the boundaries of its discretion, an appellate court should not disturb its decision, whatever it may be).

The evidence in question served to make it more probable that appellant did not mutilate and burn the appellant to cover-up the killing of complainant in self-defense. Although the nature of appellant's threats could potentially impress the jury, we do not find it would necessarily be in an irrational manner. The time needed to develop the evidence was short. The evidence was important to the State's contention that appellant intentionally committed the murder and to dispel appellant's claim of self-defense. For these reasons, we conclude the trial court did not abuse his discretion in concluding the danger of unfair prejudice did not substantially outweigh the probative value of this evidence. *See Montgomery*, 810 S.W.2d at 387. Appellant's sixth issue is overruled.

## EXCLUSION OF EVIDENCE DURING PUNISHMENT PHASE

Appellant's final issue argues the trial court erred during the punishment phase by excluding from admission into evidence the order finding him incompetent. The record reflects appellant attempted to introduce into evidence the Agreed Judgment of Incompetency signed by the trial court on October 7, 2011. The State objected the order was not relevant and the trial court sustained the objection.

Evidence is relevant at the punishment stage if it helps the factfinder decide what sentence is appropriate for a particular defendant given the facts of the case. *Ex parte Lane*, 303 S.W.3d 702, 714 (Tex. Crim. App. 2009). Appellant argues the order was relevant as mitigating evidence. He contends the jury would have reduced his sentence if it had the opportunity to consider the actual order.

The fact that appellant was found incompetent to stand trial prior to the current proceeding was known to the jury. As appellant notes in his brief, six psychiatrists and psychologists had already testified about his mental illness, including the judicial finding of appellant's incompetency which necessitated the need for his treatment in a state hospital. Thus the jury was well aware that appellant had previously been found incompetent to stand trial when it determined his sentence. Accordingly, any error in excluding the order was harmless. *See* Tex. R. App. P. 44.2(b). Appellant's seventh issue is overruled.

## CONCLUSION

Having overruled all of appellant's issues, the judgment of the trial court is affirmed.

/s/    Ken Wise
Justice

Panel consists of Justices McCally, Brown, and Wise.
Publish — Tex. R. App. P. 47.2(b).

27