**Opinion filed February 11, 2021**



## In The

# Eleventh Court of Appeals

_____

## No. 11-19-00050-CR

_____

### LARRY DEWAYNE WHITE, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 20964B**

### M E M O R A N D U M   O P I N I O N

The grand jury indicted Larry Dewayne White of murder in a two-paragraph indictment. The jury subsequently found Appellant guilty of murder, as alleged in paragraph two of the indictment, and assessed his punishment at confinement for sixty years in the Institutional Division of the Texas Department of Criminal Justice. In a single issue, Appellant challenges the sufficiency of the evidence supporting his conviction. We affirm.

*Background Facts*

Karla Martin testified that she was a next-door neighbor of both Appellant and the victim, Kenneth Wayne Williams. Williams first lived in the house, and then Appellant moved in with Williams sometime later. Mrs. Martin testified that, around 5:30 a.m. on the morning of April 29, 2017, she was awakened by a loud banging on her front door. She also heard wailing and screaming.

Mrs. Martin's husband, Jobie Martin, testified that he was also awakened by the loud banging on the front door and that he heard someone yelling: "Please help me. I mean you no harm." When Mr. Martin went outside, he saw Appellant running in the street yelling: "Please call 911," and he also saw Appellant sit on the curb, stretch out his hands, and yell: "My friend is not acting right."

Someone in the neighborhood contacted the police. Officer Ryder Foster, a patrol officer for the Abilene Police Department, testified that, when he arrived at the scene, Appellant approached his vehicle. Appellant was shirtless, but he had on a pair of jeans. Officer Foster testified that Appellant did not make much sense. Appellant would repeatedly say, "I was getting high and I got stuck," and it appeared to Officer Foster that Appellant was under the influence of something. Abilene Police Lieutenant Mark Watson arrived later. Appellant took Officer Foster and Lieutenant Watson into Appellant's residence. Appellant told the officers that his friend was inside and needed help.

Appellant took the officers into a bedroom where they observed a man's body lying on the floor. Appellant identified the man as Kenneth Williams. The body was naked, but it was covered to about mid-thigh with a green sleeping bag. Officer Foster testified that Williams was "obviously deceased." Officer Foster observed blood coming out of Williams's ear, and ligature marks on his wrists, face, and ankles. Officer Foster estimated that Williams had been dead for a couple of hours.

Around the bedroom, officers found used duct tape and strips of red cloth that looked to Officer Foster like they had been used to restrain Williams. Officers also found a crack pipe or "stem" in the room. Overall, the bedroom was in "total disarray." Lieutenant Watson testified that, from his observations, it appeared that there had been a physical altercation. However, he did not notice any cuts or abrasions on Appellant.

Appellant initially told the officers that he found Williams dead and tied up and that he cut off Williams's restraints with a pocketknife. However, Officer Foster testified that, every time he asked Appellant to tell him who restrained Williams, Appellant would smile and look down to the right, which Officer Foster thought was strange. Appellant additionally told the officers that the last time he had used drugs was the night before.

Officer Cody Dikes testified that Appellant seemed to be under the influence of some type of intoxicant. Officer Dikes also testified that, without questioning Appellant, Appellant continued to repeat the same phrases. He heard Appellant say that he did not kill the man inside, that he liked to do crack and had a crack habit, and that Williams made homosexual advances toward him but that he was not into "that kind of homosexual activity."

Officers subsequently transported Appellant to the Law Enforcement Center to be interviewed. Detective Jonathan Merrick interviewed Appellant. The State played a recording of Appellant's interview for the jury. In the recording, Appellant stated that Williams allowed Appellant to live with him when Appellant was denied for rehab. Appellant also said that, at the time of the offense, he had lived with Williams for the past three weeks.

When Appellant first began to speak about the incident, he explained that Williams was doing "ice" in his room. Apparently there was some type of disagreement. Appellant later walked into Williams's room and found him nude

3

with scratches on him and rolled up in a sleeping bag. Appellant said in the interview that he panicked and tried to perform chest compressions on Williams. Appellant denied knowing who killed Williams.

Later in the interview, however, Appellant changed his story and stated that Williams pulled a knife on him and that Appellant "just lost it." Appellant later said that he became angry with Williams because Williams would not admit that he had been stealing Appellant's things, so Appellant started kicking Williams and hitting Williams in the face with his fists. Appellant stated that, after Williams was unconscious, Appellant tied Williams up. But, at some point, Williams regained consciousness and started to yell. Appellant explained in the interview that he tried to reason with Williams and told Williams that he would let him go if he would be quiet because Appellant did not want to go to jail. Appellant stated that he used a "brown . . . instrument" to shove underwear and socks into Williams's mouth because Williams would not be quiet.

Appellant testified on his own behalf during the guilt/innocence phase of trial. In his testimony at trial, Appellant revised his story again. Appellant testified that he returned to the house after he had two drinks at a bar down the street. Appellant started to use methamphetamine once he arrived at the house. A few minutes later, Williams yelled for Appellant to come into his room to pick up Appellant's personal hygiene items. When Appellant went into Williams's room, Williams was in a sleeping bag on the floor. Appellant testified that, when he stooped down to pick up his items, Williams jumped up with a fillet knife and said to Appellant: "Man, I'm going to murder you, rob you, and rape you." Appellant testified that Williams was also high on methamphetamine and was only wearing his underwear and socks.

Appellant testified that he pleaded with Williams to stop but that Williams attacked him with the fillet knife and cut Appellant's finger. Appellant testified: "I -- when I knocked him down -- at the same time I knocked him down, I fell with

4

him, and I was strangling him at the same time . . . . And after -- after I strangled him, I thought I just put him to sleep. . . . I didn't know I had killed him." Appellant also testified that he had "just choked him out" and that he thought that he "had just put [Williams] to sleep." On cross-examination, Appellant admitted to ramming Williams's socks and underwear into Williams's mouth with a wooden stick. He further admitted to applying duct tape across Williams's mouth and choking Williams with his bare hands. Appellant testified that he did these acts out of "frustration and fear."

Dr. Tasha Greenberg, a deputy medical examiner for the Tarrant County Medical Examiner's Office, testified that, in her opinion, the primary cause of Williams's death was asphyxia due to strangulation. The secondary cause of death was blunt force head injuries. She testified that the injuries to Williams's brain were "fairly severe." In addition, Dr. Greenberg opined that Williams was bound at the time of his death.

*Analysis*

In his sole issue on appeal, Appellant contends that the evidence was insufficient to show that he intended to cause serious bodily injury to Williams. We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*

Appellant was convicted of murder as it is defined in Section 19.02(b)(2), which provides that a person commits murder if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(2) (West 2019). The indictment alleged that Appellant committed an act clearly dangerous to human life by choking

Williams with the intent to cause serious bodily injury to Williams. "Serious bodily injury" is a bodily injury "that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." PENAL § 1.07(a)(46) (West Supp. 2020).

Murder is a result-oriented offense—meaning that the proscribed conduct must have caused the death of the victim. *Walter v. State*, 581 S.W.3d 957, 969 (Tex. App.—Eastland 2019, pet. ref'd). Appellant is challenging the *mens rea* required for a conviction under Section 19.02(b)(2). Under Section 19.02(b)(2), the *mens rea* element requires only that the accused must have intended to cause serious bodily injury to an individual. *Id.* at 970; *see Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012) (citing *Lugo-Lugo v. State*, 650 S.W.2d 72, 81–82 (Tex. Crim. App. 1983)). Thus, under Section 19.02(b)(2), "the intent to kill is not required. It is sufficient to show only the intent to cause serious bodily injury and commit a clearly dangerous act." *Ramirez v. State*, 229 S.W.3d 725, 729 (Tex. App.—San Antonio 2007, no pet.) (citation omitted). Appellant contends that the evidence establishes that he only intended to keep Williams from calling out for help rather than intending to cause serious bodily injury to Williams. We disagree.

"[A] conviction under Section 19.02(b)(2) requires a showing that the defendant acted with the conscious objective or desire to create a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of any bodily member or organ." *Walter*, 581 S.W.3d at 971 (citing *Lugo-Lugo*, 650 S.W.2d at 81). Additionally, the State must show that the defendant committed an act clearly dangerous to human life that caused the death of the decedent. *Lugo-Lugo*, 650 S.W.2d at 81; *Walter*, 581 S.W.3d at 971. This element requires that the act intended to cause serious bodily injury must be "objectively *clearly dangerous to human life*." *Lugo-Lugo*, 650 S.W.2d at 81; *Walter*, 581 S.W.3d at 971.

7

In presenting his contention, Appellant focuses on his statements to the police and to the jury at the time of trial concerning his objective to keep Williams quiet by gagging him, his efforts later to attempt to resuscitate Williams, his efforts to get help for Williams, and the jury's determination that he did not intend to kill Williams. The matters concerning Appellant's objectives and his later attempts to help Williams came from his own statements and testimony. As such, these matters were inherently credibility questions for the jury to resolve. We defer to the factfinder's role as the sole judge of Appellant's credibility. *See Brooks*, 323 S.W.3d at 899. The credibility of Appellant's self-serving testimony was solely within the jury's province to determine, and the jurors were free to reject it. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (addressing the defendant's claim of self-defense); *see also Braughton v. State*, 569 S.W.3d 592, 611–13 (Tex. Crim. App. 2018) (same).

Additionally, there is evidence that supports the jury's rejection of Appellant's claims. As noted previously, Appellant testified that he choked Williams to the point that Williams passed out. We held in *Walter* that choking someone to the point of unconsciousness could constitute evidence of serious bodily injury because the jury could draw the inference that the act created a substantial risk of death. 581 S.W.3d at 972 (relying in part on *Akbar v. State*, 660 S.W.2d 834, 835–36 (Tex. App.— Eastland 1983, pet. ref'd)); *see Comeaux v. State*, No. 11-10-00308-CR, 2012 WL 2045950, at *2 (Tex. App.—Eastland June 7, 2012, pet. ref'd) (mem. op., not designated for publication) (Relying on *Akbar*, we concluded that choking a person to the point of unconsciousness can constitute serious bodily injury.).

Furthermore, there is evidence that Appellant also placed socks and underwear in Williams's mouth and that Appellant used a wooden stick to shove these clothing items into Williams's mouth. We conclude that this barbaric act, in and of itself, would permit a rational factfinder to conclude that Appellant intended

to cause serious bodily injury to Williams by choking him. In this regard, the jury is entitled to infer the defendant's intent from the circumstantial evidence, which includes all of the defendant's conduct. *Moralez v. State*, 450 S.W.3d 553, 567–68 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Additionally, this act by Appellant was clearly dangerous to human life from an objective viewpoint. *See Lugo-Lugo*, 650 S.W.2d at 81; *Walter*, 581 S.W.3d at 971.

The evidence was sufficient to support Appellant's conviction for murder under Section 19.02(b)(2). We overrule Appellant's sole issue.

*This Court's Ruling*

We affirm the judgment of the trial court.

JOHN M. BAILEY
CHIEF JUSTICE

February 11, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.