**AFFIRMED and Opinion Filed November 28, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00947-CR**

**LINDSLEY HUGH CRAVENS II, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 15th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 072669**

# MEMORANDUM OPINION

Before Justices Myers, Pedersen, III, and Garcia
Opinion by Justice Garcia

A jury found appellant guilty of murder and assessed punishment at forty years in prison and a $10,000 fine. In three issues, appellant argues: (i) the evidence is insufficient to support the jury's rejection of his self-defense claim; (ii) the trial court abused its discretion in denying his motion for new trial based on an alleged *Brady* violation; and (iii) the trial court erroneously denied the motion to suppress statements he made to the police. Finding no reversible error, we affirm the trial court's judgment.

# I.   Background

On the night in question, appellant's wife, Townie Cravens, called 911 to report that appellant had just shot his mother's boyfriend, later identified as Stephen Obar. Obar was shot in the face at close range and was dead when the paramedics arrived.

The shooting occurred in Nancy Coker's apartment. Coker is appellant's mother. Obar and his mother lived in the apartment with Coker. Appellant and his wife visited frequently and were there on the night of the shooting.

Appellant and Obar were seated in the apartment when they had an acrimonious verbal exchange. Appellant got up and said he was leaving. As appellant moved toward the kitchen counter to retrieve his belongings, Obar got up from his recliner and moved toward appellant. Coker stepped between them. Coker then heard appellant's gun fire as he shot Obar.

Appellant was charged with murder and claimed self-defense. A jury found appellant guilty and assessed punishment at forty years in prison and a $10,000 fine. Judgment was entered in accordance with the jury's verdict.

When additional discovery materials from a lab analysis were provided to appellant after the judgment was entered, appellant moved for a new trial based on alleged *Brady* violations. The trial court conducted a hearing and denied the motion. This timely appeal followed.

## II. Analysis

**Sufficiency of the Evidence**

Appellant's first issue argues the evidence is insufficient to support the jury's rejection of his self-defense claim. According to appellant, there is no evidence that his actions "constituted anything but self-defense," because he only drew his weapon after Obar got up and moved quickly and aggressively toward him. He further asserts that Obar tried to steal his gun and he therefore believed that deadly force was immediately necessary.

In evaluating a challenge to the sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The jury "is the sole judge of the credibility of the witnesses and of the strength of the evidence," and may choose to believe or disbelieve any portion of the witnesses' testimony. *See Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999); *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the jury resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex.

Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

We measure sufficiency to support a conviction by comparing the evidence presented at trial to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge reflects the governing law, the indictment, the State's burden of proof and theories of liability, and an adequate description of the offense for the particular case. *Id.*

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). Alternatively, he also commits the offense when he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *Id*. at § 19.02(b)(2).

A person acts with intent with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE ANN. § 6.03(a). He acts knowingly with respect to the nature of his conduct (or to circumstances surrounding his conduct) when he is aware of the nature of his conduct (or that the circumstances exist) or he is aware that the conduct is reasonably certain to cause the result. *See id.* at § 6.03(b). A person acts recklessly when he is aware of but consciously disregards a substantial

and unjustifiable risk that the circumstances exist or the result will occur. *See id.* at §6.03(c).

Intent, being a question of fact, is in the sole purview of the jury. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). A jury may rely on collective common sense and common knowledge when determining intent. *Ramirez v. State*, 229 S.W.3d 725, 729 (Tex. App.—San Antonio 2007, no pet.). Intent also may be inferred from the circumstantial evidence surrounding the incident, which includes acts, words, and conduct of the accused. *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a); *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). "Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

A person is justified in using force against another when and to the degree that person reasonably believes the force is immediately necessary to protect him from another's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a). "An actor is justified in using deadly force if, among other things, the actor reasonably believes deadly force is immediately necessary to protect the actor against another's use or attempted use of unlawful deadly force." *Green v. State,* 589 S.W.3d 250, 255 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd); *see* TEX. PENAL CODE ANN. § 9.32(a)(1)–(2)(A).

In a claim of self-defense, defendant bears the burden to produce evidence supporting the defense. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *Moralez v. State*, 450 S.W.3d 553, 565 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013).

After a defendant satisfies his burden by producing some evidence that supports self-defense, the State then bears the burden of persuasion to disprove self-defense. *See Braughton* at 608. The State's burden of persuasion "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Therefore, in resolving the evidentiary sufficiency issue, we look not to whether the State presented evidence that refuted evidence of self-defense, but rather we determine whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914; *Braughton*, 569 S.W.3d at 609.

Coker testified that the argument between appellant and Obar began when Obar told appellant to get up and go take a shower. Appellant got up and said, "I'll just go." Obar replied, "Just go and don't come back anymore." Coker gave Obar a

look as if to say, "why did you say that?" Obar then said, "if you don't like it, you can get out too."[1]

When appellant told Obar not to speak to his mother like that, Obar got up out of his recliner and started towards appellant. Coker believed that Obar was drunk and had drugs in his system, and she described him as "swearing and belligerent." Coker got up to stand in between Obar and appellant. Although she initially testified that Obar tried to push her away, she later clarified that he "just kind of" had his arm on her and was trying to get by. She admitted that Obar did not injure or threaten her.

At trial, Coker testified that she heard appellant say, "Stop, I don't want to shoot you." On cross-examination, she could not recall telling the police that appellant said, "Oh, I think I will just shoot you." According to Coker, Obar did not grab appellant's gun. As she stood between appellant and Obar, she heard a "pow" as appellant shot Obar.

Coker admitted that she had been in frequent contact with appellant since his incarceration and told him, "We will do whatever we have to do to get you out of this mess." She admitted that appellant "may" have sent her letters in code about her trial testimony. At trial, Coker recalled that appellant and Obar were yelling at each

---

[1] It was Coker's apartment and her name appeared on the lease.

other and she got in between them, but otherwise said she did not recall much about the incident.

Kevin Clark, a neighbor who lived in the upstairs apartment, said that appellant frequently visited Coker's apartment wearing a holstered weapon. When Clark heard the gunshot, he went outside. He saw appellant exit Coker's apartment and heard him say, "I can't believe I did that." Coker emerged shortly thereafter, and said "You S.O.B., you shot my boyfriend. I hope you burn in hell."

The medical examiner testified that Obar suffered a gunshot entrance wound below his left nostril, and a bullet and two bullet fragments were recovered from his head. The gunshot stippling surrounding the wound showed a one-to-three-foot range of fire from the muzzle of the gun to Obar—a close range shot. Obar had alcohol in his system that was twice the legal limit for intoxication. His cause of death was a gunshot to the head.

Detective Ballew, a detective with the Sherman police department, interviewed appellant at the police station. The recorded interview was admitted into evidence and played for the jury.

According to appellant, he thought Obar was being rude to his wife. Obar stood and walked toward appellant and said "something" to him. Appellant said the hair stood up on the back of his neck and he was "super afraid" and thought Obar was going to harm him. Appellant grabbed his pistol and "racked a round." He told Obar to get back twice and thought Obar was going to grab the gun.

Appellant said he did not know why he fired the gun. The only past physical altercation he had with Obar occurred three years earlier when Obar dumped him out of a chair. Appellant "felt" like he "might" be in danger but was unable to specify to what degree. Obar did not threaten him and did not have a weapon. He had no idea what Obar's intent was when he approached him and he did not know whether Obar intended to grab the gun.

Detective Ballew also took statements from Cravens and Coker on the night of the shooting. Coker remembered giving a statement to Detective Ballew but could not recall what she said. She did not dispute the statement, but simply could not recall the content. When Detective Ballew testified about the statement, he said Coker told him that appellant did not tell Obar to get back or give any warning before he shot him. Coker also told him she heard appellant say, "Oh, I think I'll just shoot you." Coker also said that she did not think the shooting was justified and she saw appellant "just snap."

Appellant took the stand in his own defense. He admitted that Obar did not threaten him, but he nonetheless felt threatened. When Obar came towards him, he picked up his gun from the kitchen counter, chambered a round, and pointed the gun at Obar. Obar reached down toward the gun, but he did not get ahold of it. Appellant felt threatened and fired one time.

Appellant admitted that he had bragged about the "textbook" shot that killed Obar in one of the letters he sent to his mother while he was incarcerated. The letters,

which were admitted into evidence, included a code for appellant and his mother to use in answering and setting up potential questions they would be asked at trial. Appellant marked the letters "legal" so they would not be read by the police.

Appellant's defense is premised on his testimony and that of his mother. This reliance is misplaced because it appears that the jury did not find these witnesses credible. *See e.g., Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (when record supports conflicting inferences we presume the jury resolved the conflicts in favor of the verdict); *Rodriguez v. State*, 546 S.W.3d 843, 860 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (jury not required to accept defense claims). Based on our review of the record, we conclude a rational trier of fact could have rejected the self-defense theory and reasonably found the elements of murder beyond a reasonable doubt. *See Braughton*, 569 S.W.3d at 609. Appellant's first issue is resolved against him.

## *Brady* Violations

Appellant's second issue argues the trial court erroneously denied his motion for new trial based on alleged *Brady* violations. We disagree.

The prosecution violates Fourteenth Amendment due process when it suppresses evidence favorable to the defendant that is material either to guilt–innocence or to punishment, regardless of the prosecution's good faith or bad faith. *See Kyles v. Whitley*, 514 U.S. 419, 432–34 (1995); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). To show a

*Brady* violation, a defendant must show all three of the following: (1) the State failed to disclose evidence regardless of the prosecution's good or bad faith, (2) the suppressed evidence is favorable to the defendant, and (3) the suppressed evidence is material in that there is a reasonable probability that had the evidence been disclosed, the outcome of trial would have been different. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999). When favorable evidence is not concealed but disclosed untimely, the defendant bears the burden to show the delay resulted in prejudice. *Kulow v. State*, 524 S.W.3d 383, 388 (Tex. App.—Houston [14th Dist.] 2-17, pet. ref'd) (citing *Little,* 991 S.W.2d at 866).

Under *Brady*, "prosecutors have a duty to learn of *Brady* evidence known to others acting on the state's behalf in a particular case." *Harm*, 183 S.W.3d at 406. (*citing Kyles*, 514 U.S. at 437–383). This includes the police. *Kyles*, 514 U.S. at 437.

Here, it is undisputed that evidence was not timely provided to the defense. Thus, the question is whether that evidence was material and favorable to the defense. *Little,* 991 S.W.2d at 866.

Ten days after appellant was convicted, the Texas Department of Criminal Justice Crime Lab in Garland completed a biology report and sent it to the District Attorney. The State provided defense counsel with the report and supporting documentation (the "Lab Report") approximately three days later.[2]

---

[2] During the hearing, the state told the court that the lab submission form was provided to the defense well before trial.

–11–

Appellant's shirt, pants, and left boot were submitted for testing. There was blood on the boot, presumptively Obar's. Although Detective Ballew had requested trace evidence/DNA testing on the gun, the Lab Report showed that was not possible because the firearms section had already done ballistics testing. Morgan Hosbrough, a forensic scientist employed by the lab, testified at the motion for new trial and authenticated the Lab Report.[3]

Detective Ballew also testified. He admitted that he testified at trial that he had not requested DNA/trace evidence testing on the gun, but the Lab Report reflected that he did. He also said that he had not submitted the gunshot residue collection kit ("GSR") for forensic examination, but the GSR was, in fact submitted. The detective testified that he was ill with COVID prior to trial and had difficulty remembering.

Detective Ballew confirmed that any DNA that could have been tested on the gun would have been destroyed by ballistics testing. He agreed that finding Obar's blood on appellant's clothing would tend to corroborate that appellant was standing in close proximity to Obar when appellant shot him. He also agreed that if DNA testing had shown Obar's blood, hand, or bodily fluid on the gun it would also be significant to the issue of proximity.

---

[3] After appellant was convicted, the District Attorney's office requested that testing be discontinued. Accordingly, no further testing was done.

Appellant contends that if DNA testing had been done on the gun as Detective Ballew requested, it might have shown that Obar touched the gun, supporting appellant's claim that Obar tried to take it from him. Moreover, he maintains that finding Obar's blood on appellant's clothing corroborated his claim that Obar was standing in close proximity when he shot him. He further argues that Detective Ballew testified untruthfully, saying that certain items that were tested had not been tested, and he was denied the opportunity to impeach him. Finally, he complains that he was denied the identity of other lab witnesses who were identified in the paperwork that was not timely provided.

Appellant has not demonstrated that any of this evidence was material. There was no dispute that appellant was close to Obar—the stippling evidence from the autopsy and all of the witnesses' testimony established that the two were in close proximity. Moreover, the trace evidence/DNA testing was not suppressed—it was not done at all. While there may have been some impeachment value in Detective Ballew's faulty recollection of what testing he requested, it would likely have been minimal in light of his explanation that it was not intentional, information was not purposefully withheld, and his illness at the time adversely impacted his recollection. And while appellant claims he was denied witnesses (the additional lab workers identified in the Lab Report), he offers no explanation about their expected testimony or how it might be material to the case.

Examining this evidence in the context of the entire record and the overall strength of the State's case, we conclude there is no reasonable probability that the result of the proceeding would have been different had the Lab Report been timely disclosed. *See Harm*, 183 S.W.3d at 409. Therefore, the trial court did not err in denying appellant's motion for new trial. Appellant's second issue is resolved against him.

**Motion to Suppress**

When the police arrived at the scene, they identified appellant as the shooter and handcuffed him. Officer Spencer Nelson attempted to get basic information from appellant, including his name, address, and whether there were additional people in the apartment. Appellant told Officer Nelson he could tell him "everything you need to know." Officer Nelson asked appellant if he would like to give him a brief overview but said he didn't need anything detailed at that time. Appellant said he would give him a basic synopsis. When Officer Nelson told appellant he was going to *Mirandize* him, appellant stated "then, I would like an attorney." Officer Nelson stopped appellant and attempted to read him his *Miranda* rights. But appellant kept talking.

Appellant raised this issue at trial, requesting that the statements he made to the police be suppressed. The trial court conducted a hearing outside the jury's presence and found that most of the statement made to Officer Nelson was

admissible.[4] Appellant's third issue argues the trial court erred in denying his motion to suppress the statements he made to Officer Nelson.[5]

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Delafuente v. State*, 414 S.W.3d 173, 177 (Tex. Crim. App. 2013). We afford almost complete deference to the trial court's determination of historical facts, especially when based on "an assessment of credibility and demeanor," but conduct a de novo review of mixed questions of law and fact that do not hinge on credibility or demeanor determinations. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We will sustain the trial court's ruling if that ruling is reasonably supported by the record and is correct on any theory of law applicable to the case. *Valtierra v. State*, 310 S.W.3d 442, 447–448 (Tex. Crim. App. 2010).

The Supreme Court requires law enforcement to inform suspects of their right to counsel and their right against self-incrimination prior to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 476–79 (1966); *see also Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). If a suspect chooses to invoke his right to remain silent, police must stop all questioning. *Miranda*, 384 U.S. at 474. If

---

[4] The court also found that all of the statement appellant subsequently made to Detective Ballew at the police station was admissible.

[5] Appellant's brief also includes a sentence asserting that the trial court erroneously concluded that his "subsequent Miranda warning and waiver at the police station after originally requesting but not being provided counsel was valid." To the extent appellant seeks to complain that the statements made to Officer Ballew at the police station should have been suppressed, the argument is waived for inadequate briefing. *See* TEX. R. APP. P. 38.1.

–15–

he invokes his right to counsel, questioning must cease until he has been afforded the opportunity to consult with counsel. *Id.*; *see also Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) (holding that once suspect invokes right to counsel during custodial interrogation, all questioning must cease "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police"); *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009). The right to counsel is invoked when a person indicates that he desires to speak to an attorney or to have an attorney present during questioning. *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995).

Whether a particular mention of a lawyer constitutes a clear invocation depends upon the contents of the statement itself and the totality of the surrounding circumstances. *Gobert*, 275 S.W.3d at 892. The test is objective: the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Dinkins*, 894 S.W.2d at 352; *Davis v. U.S.*, 512 U.S. 452, 459 (1994) (request for counsel must be unambiguous and an officer need not cease questioning if a suspect's reference to an attorney is ambiguous or equivocal in that a reasonable officer given the circumstances would have understood only that the suspect might be invoking the right to counsel). There are no "magical words" required to invoke an accused's right to counsel, but a suspect must at least express a definite desire to speak to someone and that the person be an attorney. *Dinkins*,

894 S.W.2d at 352; *see also Pecina v. State*, 361 S.W.3d 68, 79 (Tex. Crim. App. 2012); *Gobert*, 275 S.W.3d at 892.

The *Miranda* protections, however, are only triggered when the accused makes a statement while in custody and during a police interrogation. *Grubb v. State*, No. 11-20-00037-CR, 2022 WL 320915, at *3 (Tex. App.—Eastland Feb. 3, 2022, pet. denied) (mem. op., not designated for publication). Under *Miranda*, the custody analysis requires that courts consider "the circumstances surrounding the interrogation and whether a reasonable person in those circumstances would have felt that she was not free to leave." *Wexler v. State,* 625 S.W.3d 162, 167 (Tex. Crim. App. 2021) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Ultimately, our inquiry "is whether, under the circumstances, a reasonable person would have believed that her freedom of movement was restricted to the degree associated with a formal arrest." *Wexler*, 625 S.W.3d at 167 (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)). Under the circumstances present here, there is no dispute that appellant was in custody. Thus, the inquiry turns on whether appellant was interrogated.

An interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *State v. Cruz*, 461 S.W.3d 531, 536 (Tex. Crim. App. 2015) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). When applying the test for whether an interrogation has occurred, the primary focus is on the perceptions of the

suspect, rather than what the police intended. *Id.* at 536–37 (citing *Innis*, 446 U.S. at 301).

"Volunteered statements are not barred by *Miranda*, even when the accused is in custody."[6] *Pugh v. State*, 624 S.W.3d 565, 568 (Tex. Crim. App. 2021) (citing *Arizona v. Mauro*, 481 U.S. 520, 529 (1987)); *Jones v. State*, 795 S.W.2d 171, 176 (Tex. Crim. App. 1990). As conceptualized in *Miranda*, interrogation must reflect a measure of compulsion above and beyond that inherent in custody itself. *Innis*, 446 U.S. at 300. Indeed, "officers do not interrogate a suspect simply by hoping that a suspect will incriminate himself." *Mauro*, 481 U.S. at 529.

Here, after watching the video, the trial judge noted, "clearly he knew he had a right to a lawyer and then just keeps talking without any further questions by law enforcement." The court concluded that if appellant invoked the right to counsel, "he waived it by talking because the cop didn't ask him anything else." The record supports this conclusion.

Appellant does not identify, nor does the redacted video reflect that Officer Nelson posed any questions to appellant. Nonetheless, appellant seems to suggest that Officer Nelson engaged in conduct calculated to elicit an incriminating

---

[6] In addition, when a suspect invokes his right to remain silent and then reinitiates communication with law enforcement officers, he then waives his Fifth Amendment rights, and its protections fall away. *See Cross v. State*, 144 S.W.3d 521, 527 (Tex. Crim. App. 2004); *Edwards v. Arizona*, 451 U.S. 477, 484–85, (1981).

response. The evidence shows no such conduct. Indeed, the evidence shows that Officer Nelson twice attempted to *Mirandize* appellant, and appellant continued to talk. There was no interrogation. Appellant's statement was volunteered. Under these circumstances, the trial court did not err by denying the motion to suppress. *See Pugh*, 624 S.W.3d at 568. Appellant's third issue is resolved against him.

Having resolved all of appellant's issues against him, we affirm the trial court's judgment.

/Dennise Garcia/
DENNISE GARCIA
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
210947F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

LINDSLEY HUGH CRAVENS II,
Appellant

No. 05-21-00947-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the 15th Judicial
District Court, Grayson County,
Texas
Trial Court Cause No. 072669.
Opinion delivered by Justice Garcia.
Justices Myers and Pedersen, III
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered November 28, 2022