

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00471-CR

Caleb Patrick **DANIELS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Frio County, Texas
Trial Court No. 18-10-00155-CRF
Honorable Russell Wilson, Judge Presiding

Opinion by:  Beth Watkins, Justice

Sitting:  Luz Elena D. Chapa, Justice
Beth Watkins, Justice
Liza A. Rodriguez, Justice

Delivered and Filed:  August 2, 2023

AFFIRMED

Appellant Caleb Patrick Daniels challenges his murder conviction. We affirm the

judgment.

### BACKGROUND

On July 14, 2018, Caleb and his father, Dennis Eldon Daniels, met in Frio County for a

previously planned afternoon of target practice. During that outing, Caleb shot and killed Dennis.

Caleb contended he acted in self-defense. After considering the evidence, the jury found Caleb

guilty of murder and assessed punishment of fifty years' incarceration. The trial court signed a judgment consistent with the jury's verdict. Caleb now appeals.

## ANALYSIS

Caleb argues the trial court abused its discretion by: (1) admitting three of the State's trial exhibits; (2) denying his objection to hypotheticals the State presented during its voir dire of the jury panel; and (3) denying his motion to suppress statements he made during an interview with law enforcement.

### *Admission of State's Exhibits*

#### *Standard of Review*

In his first three issues, Caleb challenges the trial court's admission of State's Exhibits 38, 32, and 37A–R. We review the trial court's admission of evidence for abuse of discretion. *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021). A trial court does not abuse its discretion if its decision is within the zone of reasonable disagreement. *Id.*

#### *State's Exhibit 38*

In his first issue, Caleb challenges the admission of State's Exhibit 38, which consisted of an e-mail and attachments to the e-mail that Caleb sent to one of his friends before the shooting. The e-mail included the usernames and passwords for Caleb's social media accounts, as well as a message he wanted to be posted to his Facebook page in the event of his death. That message stated, "[I]f you're reading this, I am gone" and noted that the people reading it would likely be "shocked or surprised." It then explained that he believed his July 14, 2018 meeting with Dennis "could be the last thing I ever do" but was necessary "to end an ever-reaching cause of pain and fear for so many people." The message opined that "the Daniels family was, is, and will never be even close to okay," requested "space" for Caleb's mother, and stated that Caleb would "finally be at peace after living a life of running from unspeakable trauma."

The attachments contained similar, but shorter, messages that Caleb wanted his friend to disseminate through Snapchat and Instagram. The messages in the attachments did not mention Caleb's family or his July 14, 2018 meeting with Dennis. However, like the draft Facebook message in the e-mail, the messages in the attachments: stated that if they had been posted to Caleb's accounts, then he had died; recognized his death would shock the reader; and expressed that he was "at peace." The attachments did not contain any information that was substantively different from the message in the e-mail.

It is undisputed that the State timely disclosed the e-mail to Caleb. It is similarly undisputed that the State itself did not receive the attachments until September 8, 2021, approximately three weeks before trial. The State then disclosed the attachments to Caleb on September 20, 2021, seven days before trial began.

Caleb argues the attachments were not timely disclosed to him and their admission therefore violated both the due process requirements of *Brady v. Maryland*, 373 U.S. 83 (1963) and Texas's statutory disclosure requirements under article 39.14 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14. He also argues that both the e-mail and the attachments contained inadmissible hearsay.

A.    *Brady*

Under *Brady*, "the State has a constitutional duty to disclose to a defendant material, exculpatory evidence." *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011); *see also Brady*, 373 U.S. at 87. "[A] *Brady* claim requires that the defendant show by a preponderance of the evidence that evidence was withheld, that it was favorable to the defense, and that the evidence was material." *Keeter v. State*, 175 S.W.3d 756, 760 (Tex. Crim. App. 2005). "When favorable evidence is not concealed but disclosed untimely, a defendant bears the burden to show that the delay resulted in prejudice"—i.e., that "the result of the proceeding would have been different had

the evidence been disclosed earlier." *Kulow v. State*, 524 S.W.3d 383, 388 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

Caleb has never argued that the attachments were favorable to his defense; to the contrary, at trial he described the attachments as evidence that fell under Texas Rule of Evidence 404(b). *See Keeter*, 175 S.W.3d at 760; *see also* TEX. R. EVID. 404(b). Nor has he argued that the result of his trial would have been different if the State had disclosed the attachments earlier. *See Kulow*, 524 S.W.3d at 388. On this record, Caleb has not established a *Brady* violation. *See Keeter*, 175 S.W.3d at 760.

### B.     Article 39.14

Article 39.14 of the Texas Code of Criminal Procedure provides, in part:

> [A]s soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case and their investigators and their notes or report, or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state.

TEX. CODE CRIM. PROC. art. 39.14(a). The State's statutory obligation to disclose evidence under article 39.14 "is much broader" than the constitutional obligations imposed by *Brady*. *See, e.g.*, *Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021); *Ex parte Martinez*, 560 S.W.3d 681, 702 (Tex. App.—San Antonio 2018, pet. ref'd).

We will assume, without deciding, that the disclosure of the attachments one week before trial violated article 39.14. Statutory violations are non-constitutional error subject to a harm analysis. *See Gray v. State*, 159 S.W.3d 95, 97–98 (Tex. Crim. App. 2005). Consequently, Caleb is not entitled to a reversal of the judgment unless the admission of the attachments affected his

substantial rights. *See Sopko v. State*, 637 S.W.3d 252, 256–57 (Tex. App.—Fort Worth 2021, no pet.). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

As explained above, the timely disclosed e-mail and the challenged attachments contained essentially the same information. We therefore cannot say the trial court's admission of the attachments had a substantial or injurious effect on the jury's verdict. *Id*. at 271.

C.      Hearsay

Caleb also argues that the e-mail and the attachments contained inadmissible hearsay. It is undisputed, however, that he authored both the e-mail and the attachments. When a party's own statements are offered against him, those "statements are not hearsay and they are admissible on the logic that a party is estopped from challenging the fundamental reliability or trustworthiness of his own statements." *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999); *see also* TEX. R. EVID. 801(e)(2)(A). Because the e-mail and attachments were Caleb's own statements, the trial court did not abuse its discretion by overruling his hearsay objection to those exhibits. *See Trevino*, 991 S.W.2d at 853.

We overrule Caleb's first issue.

*State's Exhibit 32*

In his second issue, Caleb challenges the admission of State's Exhibit 32, which was one of nineteen postmortem photographs of Dennis's body that were admitted at trial.

Texas Rule of Evidence 403 permits a trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" TEX. R. EVID. 403. In the trial court, Caleb argued State's Exhibit 32 should be excluded because "the cumulative nature of [the] photos is extremely and unfairly prejudicial." On appeal, he argues State's Exhibit

32 was unfairly prejudicial because it was "gruesome," "graphic," and "inflammatory." Because both Caleb's trial objection and his appellate complaint assert that the probative value of State's Exhibit 32 was outweighed by the danger of unfair prejudice, we will assume for the purposes of this opinion that Caleb preserved this issue for our review. *See id.*; *see also Keeter*, 175 S.W.3d at 760 ("We have said that we should avoid splitting hairs when determining whether a claim has been procedurally defaulted.").

"The admissibility of a photograph is within the sound discretion of the trial judge." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). If verbal testimony about the matter depicted in the photograph is admissible, the photograph itself will generally also be admissible. *Id.* "A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked." *Young v. State*, 283 S.W.3d 854, 874 (Tex. Crim. App. 2009).

"Photographs of a complainant's injuries are admissible under Rule 403 if they 'show only the injuries that the victim received and are no more gruesome than would be expected.'" *Moralez v. State*, 450 S.W.3d 553, 569 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (quoting *Shuffield v. State*, 189 S.W.3d 782, 787–88 (Tex. Crim. App. 2006)). Of the nineteen admitted photographs of Dennis's body, seven were taken at the scene of the shooting and twelve were taken in connection with the autopsy. State's Exhibit 32 is an autopsy photograph. It is in color and shows Dennis's body in profile from the waist up, shirtless and lying on a body bag. There is what appears to be a closed incision in the neck and upper chest, a wound in the upper left arm, and peeling skin on the left shoulder and midsection. The medical examiner who performed the

autopsy testified without objection that such peeling is common "when someone is kind of out in the heat for a little while after they died." *See Gallo*, 239 S.W.3d at 762.

The trial court admitted the photographs, including State's Exhibit 32, during the medical examiner's testimony about the path the bullets took through Dennis's body. The trial court could have reasonably concluded that State's Exhibit 32 "added to the probative value of the State's case by assisting the jury in understanding the testimony presented regarding the injuries sustained by the complainant." *Moralez*, 450 S.W.3d at 569. The trial court also could have reasonably concluded the exhibit was "not overly gruesome" and "did not pose the potential of impressing the jury in some irrational way." *Shuffield*, 189 S.W.3d at 788.

Moreover, while the State presented nineteen postmortem photographs, Caleb objected to only one. The trial court could have reasonably concluded that the admission of nineteen photographs instead of eighteen would not "consume an inordinate amount of time or merely repeat evidence already admitted." *Gigliobianco v. State*, 210 S.W.3d 637, 642 (Tex. Crim. App. 2006); *Ladd v. State*, 3 S.W.3d 547, 569 (Tex. Crim. App. 1999). For that reason, we cannot say the trial court abused its discretion by overruling Caleb's claim that State's Exhibit 32 was cumulative.

Because the trial court's admission of State's Exhibit 32 is within the zone of reasonable disagreement, the trial court did not abuse its discretion by admitting that exhibit. *See Shuffield*, 189 S.W.3d at 788. We overrule Caleb's second issue.

*State's Exhibits 37A–R*

In his third issue, Caleb challenges the trial court's admission of State's Exhibits 37A–R. These exhibits were eighteen handwritten letters that Caleb authored before the shooting and mailed to a friend with instructions to distribute them in the event of his death. The friend who received the letters testified that she returned them to Caleb after the shooting, and the evidence

shows that Caleb himself turned the letters over to police. The first letter, State's Exhibit 37A, mentioned that Dennis had "sent [Caleb] a gift card to buy a gun," explained that Caleb had "a really bad feeling about" an upcoming meeting with Dennis, and expressed Caleb's belief that Dennis's "idea of hashing things out involve[d] [Caleb's] death." The letter further stated, "I'll either walk away from this situation, or I won't. If I pass that day, know that I'll finally be at peace. And if I live, I'll finally be free to live my own life. I won't have to move every year in fear that I'll be found and killed." The letter concluded by instructing its recipient, "If you don't hear from me by [July] 21st, assume the worst." State's Exhibits 37B–R were shorter letters that did not express fear of Dennis or refer to any planned meeting. However, like State's Exhibit 37A, each letter informed the reader that Caleb had died.

It is undisputed that Caleb wrote the letters, and he concedes that "[a]n admission by a party opponent is not hearsay." However, he argues the letters constituted inadmissible hearsay because they did not contain any explicit "admissions." As explained above, Texas Rule of Evidence 801 provides that a party's own statements are not hearsay when those statements are offered against him. TEX. R. EVID. 801(e)(2)(A); *Trevino*, 991 S.W.2d at 853. The relevant portion of Rule 801's definition of hearsay looks only to whether the evidence is a statement "offered against an opposing party [that] was made by the party in an individual or representative capacity[.]" TEX. R. EVID. 801(e)(2)(A). The definition does not require that the statement constitute a confession-style "admission" by the party. *See id.* Because the letters were Caleb's own statements, they were not hearsay. *See id.*

Caleb also argues the letters were inadmissible because they "were not relevant to the crime charged, and contained no details related to any elements of the crime itself." While "[r]elevant evidence is generally admissible, irrelevant evidence is not." *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); *see also* TEX. R. EVID. 402. "Evidence is relevant if: (a) it has any

tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401.

State's Exhibit 37A tended to show that Caleb: (1) had access to a firearm; (2) had a strained relationship with Dennis; and (3) believed the planned meeting with Dennis might end in Caleb's death. While State's Exhibits 37B–R were less detailed than State's Exhibit 37A, those exhibits also tended to show that Caleb believed he might not survive the meeting with Dennis. The trial court could have reasonably concluded those facts were of consequence to both the State's claim that Caleb murdered Dennis and Caleb's own claim that he acted in self-defense. *See id.*; TEX. PENAL CODE ANN. § 19.02(b) (required elements of murder); TEX. PENAL CODE ANN. § 9.32 (required elements of deadly force self-defense claim). Accordingly, we cannot say the trial court abused its discretion by concluding that State's Exhibits 37A–R were relevant. TEX. R. EVID. 401.

Finally, Caleb argues that the probative value of State's Exhibits 37A–R was outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403.[1] "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* Exhibits 37A–R showed that before the shooting, Caleb wrote eighteen letters expressing fear of Dennis, anticipating his own death, or both. The trial court could have reasonably determined that the preparation and distribution of the

---

[1] The State contends Caleb did not preserve his Rule 403 objection because his "objection at trial was that [the letters] were hearsay and irrelevant." We disagree. Caleb filed a written pre-trial motion to exclude the letters that were eventually designated as State's Exhibits 37A–R. That motion argued the letters were "unfairly prejudicial, confusing and misleading, and therefore inadmissible under Rule 403[.]" When the State offered the letters at trial, Caleb renewed his pre-trial objection, and the trial court overruled that objection. This complaint is therefore preserved for our review. TEX. R. EVID. 103(a); TEX. R. APP. P. 33.1(a).

letters was probative of Caleb's state of mind during the relevant time. *See* TEX. PENAL CODE § 19.02(b) (murder charge requires the State to show defendant acted intentionally or knowingly). It also could have reasonably concluded that the jury's potential emotional reaction to the letters was outweighed by the State's need to rebut Caleb's claim that he reasonably believed his use of deadly force was immediately necessary to protect himself from Dennis. *See* TEX. PENAL CODE § 9.32; *see also Braughton v. State*, 569 S.W.3d 592, 608–09 (Tex. Crim. App. 2018).

We overrule Caleb's third issue.

### *Voir Dire Hypotheticals*

In his fourth issue, Caleb argues the trial court abused its discretion by denying his objection to hypotheticals the State presented during voir dire. While questioning the venire panel, the State explained that the statutory range of punishment for the charged offense was "between 5 years and 99 years and up to a $10,000 fine." The State then described two hypothetical situations—one that involved a shooting during a home invasion, and another involving the mercy killing of an elderly spouse—and identified both situations as "murder in the eyes of Texas." The State told the venire:

> So now, when I ask you can you consider the full range of punishment, that means there are different scenarios. There are differing cases that come with this and different punishments that should be allowed for each of these types of cases.
>
> So now going back to that who here can consider the full range of punishment at this point without knowing any of the facts of the case, can everybody here consider the full range of punishment? Can anybody here not do that?

Relying on *Cardenas v. State*, 325 S.W.3d 179 (Tex. Crim. App. 2010), Caleb objected that the State's use of the two hypotheticals created an improper commitment question.[2] The trial court

---

[2] "[A] party may ask the potential juror if he could consider the minimum of five years' imprisonment in a murder case, but he may not ask if the juror could consider five years in prison in a case in which the State alleged that the defendant tortured, garroted, poisoned, and pickled the victim." *Cardenas*, 325 S.W.3d at 184 (internal quotation marks omitted).

overruled Caleb's objection, and the State again asked the panel, "[C]an everybody consider that full range of punishment that we're talking about once they hear all of the facts?"

Under these circumstances, we need not determine whether the State's use of hypotheticals led to an improper commitment question. This is because even if the State's question was improper, the record does not show that Caleb was harmed by it. *See* TEX. R. APP. P. 44.2; *Sanchez v. State*, 165 S.W.3d 707, 713–14 (Tex. Crim. App. 2005).

"Under Rule 44.2(b), reviewing courts should assess the potential harm of the State's improper commitment questioning by focusing upon whether a biased juror—one who had explicitly or implicitly promised to prejudge some aspect of the case because of the State's improper questioning—actually sat on the jury." *Sanchez*, 165 S.W.3d at 713. "There is no single, specific rule by which reviewing courts should assess" whether an appellant was harmed by an improper commitment question. *Id.* at 714. However, the Texas Court of Criminal Appeals has promulgated a list of factors that courts may consider in determining whether a jury panel was "poisoned" by such a question. *See id.* at 713–14. Those factors include:

1) whether the questions were unambiguously improper and attempted to commit one or more veniremen to a specific verdict or course of action;

2) how many, if any, veniremen agreed to commit themselves to a specific verdict or course of action if the State produced certain evidence;

3) whether the veniremen who agreed to commit themselves actually served on the jury;

4) whether the defendant used peremptory challenges to eliminate any or all of those veniremen who had committed themselves;

5) whether the defendant exhausted all of his peremptory challenges upon those veniremen and requested additional peremptory challenges to compensate for their use on improperly committed veniremen;

6) whether the defendant timely asserted that a named objectionable venireman actually served on the jury because he had to waste strikes on the improperly committed jurors; and

7) whether there is a reasonable likelihood that the jury's verdict or course of action in reaching a verdict or sentence was substantially affected by the State's improper commitment questioning during voir dire.

*Id.*

Here, on initial questioning by Caleb's attorney and before the State presented the challenged hypotheticals, several members of the venire appeared to indicate they could not consider a five-year sentence on a murder charge. "A juror who states that he cannot consider the minimum punishment for a particular statutory offense is subject to a challenge for cause." *Cardenas*, 325 S.W.3d at 185. However, when the State later posed its two hypotheticals and then individually asked the venire members whether they could consider the entire range of punishment, no venire members indicated an inability to do so. *See Sanchez*, 165 S.W.3d at 714. Additionally, several of the venire members, including some who initially indicated a reluctance to consider the minimum sentence, confirmed during individual questioning that they could consider the entire range of punishment.

Caleb did not challenge any venire members on the ground that they could not consider the entire range of punishment. *See id.* Caleb also did not request any additional peremptory challenges or argue that he had used all his peremptory strikes on objectionable venire members. *See id.* Additionally, Caleb affirmatively stated that he did not object to the jury that was eventually seated. *See id.*; *see also* TEX. CODE CRIM. PROC. ANN. art. 35.16(a) (with exceptions not applicable here, challenges for cause can be waived). Finally, because the State's hypotheticals did not bear any resemblance to the facts of this case, the likelihood that the jury's verdict was affected by those hypotheticals appears to be low. *See Sanchez*, 165 S.W.3d at 714; *see also Montoya v. State*, Nos. 03-15-00125-CR & 03-15-00126-CR, 2016 WL 4527599, at *3 (Tex. App.—Austin Aug. 23, 2016, no pet.) (mem. op., not designated for publication); *Ng v. State*, No. 04-12-00392-CR,

2013 WL 4009665, at *4 (Tex. App.—San Antonio Aug. 7, 2013, no pet.) (mem. op., not designated for publication). For these reasons, the record does not support a conclusion that Caleb was "tried by a juror that had prejudged him or some aspect of his case because the State had improperly committed one or more veniremen to a verdict or course of action before hearing any evidence[.]" *Sanchez*, 165 S.W.3d at 714.

We overrule Caleb's fourth issue.

### *Motion to Suppress*

In his fifth issue, Caleb argues the trial court abused its discretion by admitting evidence of statements he made during a July 25, 2018 interview with law enforcement because: (1) he did not make the statements voluntarily; and (2) the interview was a custodial interrogation and he did not receive the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966) and Texas Code of Criminal Procedure article 38.22.

### *Standard of Review*

We review a trial court's ruling on a motion to suppress for abuse of discretion. *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2022); *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). In reviewing claims that a statement was inadmissible because it was involuntary and/or the unwarned product of custodial interrogation, we apply a bifurcated standard of review. *Wexler*, 625 S.W.3d at 167; *Cameron v. State*, 630 S.W.3d 579, 591 (Tex. App.—San Antonio 2021, no pet.). We give almost total deference to the trial court's assessment of historical facts, but we apply de novo review to the court's ultimate legal conclusions. *Wexler*, 625 S.W.3d at 167; *Cameron*, 630 S.W.3d at 591.

When the record contains "indisputable visual evidence contained in a videotape," we may review that evidence de novo "even if the trial court did not refer to this evidence in its findings." *Cameron*, 630 S.W.3d at 591 (internal quotation marks omitted). Accordingly, in reviewing this

issue, we will consider both a video of the July 25, 2018 interview and testimony from the interviewing officers.

*Voluntariness*

A.     The Trial Court's Findings of Fact and Conclusions of Law

A defendant's statement may be used as evidence against him if the record shows it "was freely and voluntarily made without compulsion or persuasion[.]" TEX. CODE CRIM. PROC. ANN. art. 38.21. When a defendant seeks to suppress his statement on the ground that it was involuntary, the trial court must hold a hearing on that issue outside the presence of the jury. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *Alvarado*, 912 S.W.2d at 211. During the proceedings below, the trial court held the hearing required by section 6 of article 38.22 and subsequently admitted Caleb's statements into evidence. However, it did not enter written findings of fact and conclusions of law regarding the voluntariness of Caleb's statements. *See* TEX. CODE CRIM. PROC. art. 38.22, § 6. We therefore abated the appeal and remanded this issue to the trial court for entry of the required findings and conclusions. *See id.*; *Vasquez v. State*, 411 S.W.3d 918, 920 (Tex. Crim. App. 2013).

On May 22, 2023, pursuant to an order from this court, the trial court signed written findings of fact and conclusions of law in which it found that Caleb "was not under arrest at any time during or at the end of the interrogation, he was allowed to take breaks, he was told that he could leave at any time, and while he could not go anywhere he wanted to within DPS headquarters, this was true of any visitor." The trial court also found Caleb "did not appear intoxicated, hallucinating, suffering from any medical problems, and no evidence was presented that he was mentally incompetent"; he answered the questions presented to him on July 25, 2018 "in a competent manner"; and he "was neither threatened, coerced, or beaten during the interview." The trial court then applied case law to these findings and concluded "there [were] no incidents of

police overreaching" and that Caleb's "statements made to the Texas Rangers on July 25, 2018, were not involuntarily made under either article 38.22(6), 38.22(3), or the Due Process Clause."

B.      Applicable Law

In reviewing the trial court's conclusion that Caleb's statements were voluntary, we must examine the totality of the circumstances surrounding the making of the statements. *Lopez v. State*, 610 S.W.3d 487, 489 (Tex. Crim. App. 2020). We consider claims of involuntariness under both the Due Process Clause of the United States Constitution and articles 38.21 and 38.22 of the Texas Code of Criminal Procedure. *Id.* at 494. To establish that a statement was involuntary for federal due process purposes, "a defendant must show (1) that police engaged in activity that was objectively coercive, (2) that the statement is causally related to the coercive government misconduct, and (3) that the coercion overbore the defendant's will." *Id.*

Claims of involuntariness under the Texas Code of Criminal Procedure "can be, but need not be, predicated on police overreaching." *Id.* at 495. Under Texas law, a confession may be involuntary if, for example, it is "given under the duress of hallucinations, illness, medications, or even a private threat[.]" *Id.* (internal quotation marks omitted).

C.      Application

Caleb has not argued, and we see nothing in the record indicating, that the statements he made in the July 25, 2018 interview were involuntary because of non-police factors such as hallucination, illness, medication, or outside threats. *See id.* Accordingly, we consider only whether Caleb's statements were rendered involuntary by police overreach. *Id.* at 495–96.

The video of the July 25, 2018 interview and the interviewing officers' testimony showed the following:

- Caleb was interviewed by law enforcement in connection with the shooting prior to July 25, 2018 and was released from that prior interview without hindrance.

- The July 25, 2018 interview was scheduled to accommodate Caleb's pre-existing vacation plans.

- Caleb drove himself to the interview.

- The interview took place in a non-public, secure part of a Texas Department of Public Safety facility in San Antonio. Because Caleb needed to be buzzed in and out of that part of the building, he checked in at the front desk and entered with a visitor's pass.[3]

- The interview lasted approximately three hours. For some of that time, Caleb was alone in the interview room with the door open.

- The interview was conducted by two officers.

- Caleb knew the interviewing officers knew he had shot Dennis.

- The officers told Caleb they would be asking "hard" questions about his family history and the day of the shooting.

- The officers did not handcuff or otherwise physically restrain Caleb at any point.

- The officers told Caleb multiple times that he was not under arrest and would not be arrested that day.

- The officers told Caleb he could go outside, get a drink of water, or use the restroom if he wanted to do so.

- When Caleb asked to use the restroom, one of the officers escorted him to the restroom but did not stay with him or monitor him; the video showed the escorting officer returned to the interview room alone while he waited for Caleb.

- The officers told Caleb they were "here to help [him]" and said they could not help him unless he was honest with them. They also told him that if he was not honest, he would "always have that weighing on [his] conscience."

- Caleb initially told the officers he shot Dennis because Dennis began shooting at him. The officers told Caleb his version of events did not make sense and they believed he was lying about his claimed fear of Dennis. Caleb subsequently made statements that seemed to conflict with his claim of self-defense. Specifically, Caleb admitted: (1) he, not Dennis, shot first; and (2) after he shot Dennis, he picked up the gun Dennis had been using and fired it in the direction of where Caleb had been standing before the shooting.

---

[3] In his brief, Caleb suggests the interviewing officer's testimony on this point showed he "was not free to leave during the interview." We disagree. The interviewing officer testified only that Caleb could not move freely through the secure part of the building. Because the trial court's finding that "while [Caleb] could not go anywhere he wanted to within DPS headquarters, this was true of any visitor" is consistent with this testimony, we must defer to it. *See Wexler*, 625 S.W.3d at 167.

- The officers did not raise their voices or make any physically threatening motions.

- Caleb became emotional during parts of the interview, but he did not appear to be overwhelmed or confused. When he did not understand a question, he requested clarification, which the officers provided.

- The officers told Caleb they would inform the district attorney that he had cooperated with their questioning. The officers did not make any promises of leniency, and they told Caleb that the decision of whether to charge him with a crime was not theirs to make.

- Caleb did not ask to leave at any time during the interview.

- At the conclusion of the interview, Caleb agreed to ride with the interviewing officers to his home in San Marcos to collect the letters that were eventually designated as State's Exhibits 37A–R. He also consented to turn those letters over to the officers and signed a written consent form allowing the officers to search his phone.

- In San Marcos, the officers stayed in the car and did not accompany Caleb into his home. The officers then drove Caleb back to the DPS facility in San Antonio.

- Caleb was not handcuffed during the ride to or from San Marcos.

- When the officers and Caleb returned to San Antonio, Caleb left the DPS facility in his own vehicle.

These circumstances do not support a conclusion that Caleb's July 25, 2018 statements were involuntary. *See Cameron*, 630 S.W.3d at 592–95. Caleb has not argued—and the record does not show—that the officers made any false promises or engaged in any trickery or threats. *See id.* at 594. Nor does the record show that the officers attempted to physically intimidate Caleb. While the officers urged Caleb to be "honest" with them and told him it would "weigh[] on his conscience" if he was not, we have previously held that "largely vague and general" appeals to an individual's "moral sense of right and wrong" did not render a statement involuntary. *Id.* Although the video showed the interview was tense and Caleb became emotional, we see nothing to support a conclusion that the officers' behavior "'was such as to overbear the will of [Caleb] and bring about a confession not freely determined.'" *Id.* (quoting *Green v. State*, 934 S.W.2d 92, 99–100

(Tex. Crim. App. 1996)). On this record, we cannot say the trial court erred by concluding Caleb's statements were voluntary.

### *Custodial Interrogation*

Caleb also argues his statements were inadmissible because he was subjected to custodial interrogation and the interviewing officers did not advise him of his rights under *Miranda* and article 38.22. In its May 22, 2023 written findings of fact and conclusions of law, the trial court concluded Caleb "was not in custody" during the July 25, 2018 interview. Because the protections of *Miranda* and article 38.22 apply only to statements made during a custodial interrogation, we begin by examining the trial court's finding that Caleb was not in custody. *See Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009); *Fiedler v. State*, 991 S.W.2d 70, 79 (Tex. App.—San Antonio 1998, no pet.).

### A. Applicable Law

In determining whether a defendant's statements were the product of custodial interrogation, the ultimate question is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Gardner*, 306 S.W.3d at 293–94 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "At trial, the defendant bears the initial burden of proving that a statement was the product of custodial interrogation." *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (internal quotation marks omitted). "[T]he State has no burden at all unless '*the record as a whole clearly establishe*[*s*]' that the defendant's statement was the product of custodial interrogation by an agent for law enforcement." *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005) (quoting *Paez v. State*, 681 S.W.2d 34, 36 (Tex. Crim. App. 1984)).

B.    Application

The circumstances we considered in our review of the voluntariness of Caleb's statements are also relevant here. While he was questioned in a secure, non-public part of a DPS facility, "[s]tationhouse questioning does not, in and of itself, constitute custody." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Additionally, although Caleb was the only suspect in Dennis's death, an interrogation is not rendered custodial merely because the individual being questioned is the focus of a police investigation. *Gardner*, 306 S.W.3d at 293. Furthermore, the officers told him multiple times that he was not under arrest; they did not exert any physical control over him; he did not ask to leave; and he arrived at and left the DPS facility in his own vehicle. *See Meek v. State*, 790 S.W.2d 618, 621–23 (Tex. Crim. App. 1990); *Cameron*, 630 S.W.3d at 593. These facts did not establish that the interview restrained Caleb's freedom to the extent that he was in custody. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

The record also showed, however, that Caleb made statements that were inconsistent with his claim of self-defense. Early in the interview, he told the officers he shot Dennis after Dennis began shooting at him. Upon further questioning, however, he admitted this was not true. These inconsistent statements are significant to our analysis because the Texas Court of Criminal Appeals has held that "a crucial admission could turn a noncustodial encounter into a custodial one[.]" *See Dowthitt*, 931 S.W.2d at 256–57; *see also State v. Ortiz*, 382 S.W.3d 367, 373 (Tex. Crim. App. 2012).

In *Dowthitt*, the "crucial admission" was the defendant's statement that he had been present during a murder. *Dowthitt*, 931 S.W.2d at 256–57. Under those circumstances, that statement established probable cause to arrest the defendant, and the *Dowthitt* court noted that "a reasonable person would have realized the incriminating nature of the admission." *Id.* at 257. The court further noted that the defendant made the crucial admission approximately twelve hours into the

interrogation and that the interviewing officers exercised physical control over the defendant by, for example, "accompanying [him] at restroom breaks" and "ignoring [his] requests to see his wife[.]" *Id.* The *Dowthitt* court held that these facts, when considered together, established that "'custody' began" at the moment of the admission. *Id.* at 256–57.

In *Ortiz*, the defendant admitted during roadside questioning following a traffic stop that he was on probation "'for drugs.'" *Ortiz*, 382 S.W.3d at 370. With the defendant's consent, the police searched the defendant and his vehicle. *Id.* They also handcuffed and patted down the defendant's wife, found "'something'" under her skirt, and "announced, in the [defendant's] presence," that they had "found 'something[.]'" *Id.* at 370, 375. When the police subsequently handcuffed the defendant and questioned him, he admitted he was transporting cocaine. *Id.* at 370. At the time of his admission, there were "at least two police cars and three officers" on the scene. *Id.* at 374. Under these circumstances, the trial court, the court of appeals, and the Texas Court of Criminal Appeals all concluded the defendant was "in custody" at the time of his admission. *Id.* at 371–73.

The facts of this case are distinguishable from both *Dowthitt* and *Ortiz*. Here, the fact that Caleb shot Dennis was never in dispute; the only question was whether he acted in self-defense. *Cf. Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) (accused "cannot both invoke self-defense and flatly deny the charged conduct"). The police therefore had—and Caleb knew they had—"reasonably trustworthy information sufficient to warrant a reasonable person to believe [Caleb] ha[d] committed . . . an offense" before Caleb entered the interview room on July 25, 2018. *Cf. id.*; *see also Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997) (defining probable cause to arrest). While a reasonable person may "have realized the incriminating nature of" statements that appeared to contradict Caleb's self-defense claim, those statements did not establish probable cause for his arrest that was previously lacking. *Cf. Ortiz*, 382 S.W.3d at 373;

*Dowthitt*, 931 S.W.2d at 257. Moreover, we see no other circumstances of the interrogation that showed the officers restrained Caleb's freedom to the degree associated with a formal arrest. *Cf. Ortiz*, 382 S.W.3d at 375; *Dowthitt*, 931 S.W.2d at 255.

After considering the totality of the circumstances, we cannot say Caleb was "physically deprived of [his] freedom of action in any significant way [or] placed in a situation that would lead [him] to believe that [his] freedom of movement had been significantly restricted." *Cameron*, 630 S.W.3d at 593. Accordingly, we must conclude the trial court did not err by finding Caleb was not in custody on July 25, 2018.[4] *See id.*; *see also Wilkerson*, 173 S.W.3d at 532.

For these reasons, the trial court did not abuse its discretion by admitting evidence of Caleb's July 25, 2018 statements. We overrule Caleb's fifth issue.

## CONCLUSION

We affirm the trial court's judgment.

Beth Watkins, Justice

DO NOT PUBLISH

---

[4] In its May 22, 2023 findings of fact and conclusions of law, the trial court found Caleb "was properly admonished about his rights" before the July 25, 2018 interview. We see no evidence of such admonishment in the video of the interview. However, because we have held the evidence supports the trial court's finding that Caleb was not in custody at the relevant time, we may not reverse the judgment on this basis. *See, e.g.*, *Estrada v. State*, 313 S.W.3d 274, 294–95 (Tex. Crim. App. 2010) (citing *Mathiason*, 429 U.S. at 495).